**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

**HIGHLAND HOLDINGS, INC.,**
**d/b/a HIGHLAND HOMES, INC.,**
**and ROBERT J. ADAMS,**

      **Plaintiffs,**                          **Case No: 8:14-cv-01334-SDM-TBM**

**vs.**

**MID-CONTINENT CASUALTY**
**COMPANY,**

      **Defendant.**

_____/

## PLAINTIFF'S TRIAL BRIEF

Plaintiff, Highland Holdings, Inc., d/b/a Highland Homes, Inc., ("Highland Holdings"), pursuant to the Court's Order (Doc. 31), files its trial brief.

### Summary of the Nature Case

Highland Holdings brought this action to obtain a declaratory judgment that Defendant, Mid-Continent, has a duty to indemnify Highland Homes in connection with a lawsuit filed on September 23, 2013, in the Middle District of Florida and captioned *Home Design Services, Inc. v. Highland Holdings, Inc. et al.* filed, ("Underlying Lawsuit"). The underlying plaintiff, Home Design Services, Inc. ("Home Design"), alleged that Highland Homes utilized architectural designs copyrighted by Home Design. The underlying complaint sought actual and statutory damages arising from Highland Homes' alleged infringement of Home Design's copyrights – the Casa Key II, the Owenburg, and the Whitney. The Casa Key model was later added to the litigation. The underlying complaint also sought injunctive relief, attorney's fees, and costs.

As a result of Mid-Continent's failure to provide Highland Holdings with an adequate defense, essentially terminating the defense, and Mid-Continent's material change in the defense, Highland Holdings properly rejected the defense and entered into a settlement with Home Design in the amount of $650,000.00.  Highlands Holdings paid the settlement amount.  Mid-Continent has refused to indemnify Highland Holdings.

### Highland Holdings' Position on Potential Issues for Trial

Many of the issues for trial have been set forth in the Parties' motions for summary judgment and responses and in Mid-Continent's motions in limine and Highland Holdings' responses.  Highland Holdings will thus briefly address each issue that possibly remains for trial, depending on the Court's rulings on the motions for summary judgment.

### A.    Insurance Contract Interpretation

" 'Florida law provides that insurance contracts are construed in accordance with the plain language of the policies as bargained for by the parties.' "  *Burlington Ins. Co. v. Normandy Gen. Partners*, 560 F. App'x 844, 847 (11th Cir. 2014) (citing *Auto-Owners Ins. Co. v. Anderson,* 756 So. 2d 29, 34 (Fla. 2000)).    Courts "look at the policy as a whole and give every provision its full meaning and operative effect."  *Hyman v. Nationwide Mut. Fire Ins. Co.*, 304 F.3d 1179, 1186 (11th Cir. 2002).  "The scope and extent of insurance coverage is determined by the language and terms of the policy."  *Burlington*, 560 F. App'x at 847 (quotation marks omitted).  If that language is unambiguous, it governs.  *Id.*  "If the relevant policy language is susceptible to more than one reasonable interpretation, one providing coverage and the other limiting coverage, the insurance policy is considered ambiguous, and must be interpreted

liberally in favor of the insured and strictly against the drafter who prepared the policy." *Id.*

Under Florida law, the "insurer has the burden of proving the applicability of any exclusion to coverage under a policy." *Auto-Owners Ins. Co. v. Am. Bldg. Materials, Inc.*, 820 F. Supp. 2d 1265, 1269 (M.D. Fla. 2011). "When an insurer relies on an exclusion to deny coverage, it has the burden of demonstrating that the allegations of the [underlying] complaint are cast solely and entirely within the policy exclusion and are subject to no other reasonable interpretation." *Id.* (quotation marks omitted). "Exclusionary clauses are disfavored and are 'always strictly construed' in favor of the broadest coverage." *Id.*

## B.    Mid-Continent's Policies Provide Coverage

The primary issue in this case is whether the policies issued by Mid-Continent provide coverage for the allegations made in the underlying litigation. If there is coverage, the ultimate issue is whether Mid-Continent was prejudiced by the settlement, and that issue is easily decided in Highland Homes' favor.

Mid-Continent will not be able to prove prejudice. If there is coverage, then Mid-Continent must pay because, as will be shown, the settlement was reasonable and certainly did not prejudice Mid-Continent. The amount paid by Highland Holdings was significantly less than the potential cost of trial and judgment. If there is no coverage, the point is obviously moot because Highland Holdings already paid the settlement and Mid-Continent will not have to indemnify it for that amount.

As Highland Holdings argued in its motion for summary judgment, Highland Holdings is entitled to coverage for advertising injury because the alleged infringing

advertisements occurred during the policy period.   Pursuant to the policy, the advertisement injury occurred when the flyers were first published, and the advertising is the publication of the allegedly infringing design.   There is no contrary evidence to dispute that the dates of first advertising for the Casa Key, Casa Key II, and Owenburg models were within Mid-Continent's policy period.   Mid-Continent's position as to the relevant date for coverage has shifted several times over the course of the litigation. Mid-Continent's position, articulated through Alycia Stevens, its claims adjuster, was that the relevant date was the date of construction, which then changed to the date the contracts were entered into, which then changed based on an alleged lack of proof of when the advertising occurred.   Mid-Continent will be unable to present any case law that establishes a requirement to show that each contracted person relied upon the advertised design in order for there to be coverage under the policy.

Mid-Continent argues that it never had the necessary information regarding when the advertising first occurred or other details relating to what the advertising consisted of, contrary to Defendant's newest position, but Highland Holdings did provide information regarding the advertisement in its answers to interrogatories and response to Mid-Continent's request for admissions.   Prior to Kirby Pancoast's deposition, the corporate representative for Mid-Continent, this was never the issue for Mid-Continent, however, and nothing was ever pursued by Mid-Continent in this area.   As Highland Holdings was claiming coverage for offenses during the policy periods, it was Mid-Continent's burden to prove "that the allegations of the [underlying] complaint are cast solely and entirely within the policy exclusion and are subject to no other reasonable interpretation." *Am. Bldg.*, 820 F. Supp. 2d at 1269.   Mid-Continent has not carried its

burden.   Also, it must be noted that no argument Mid-Continent has made would possibly exclude the Owenburg, Casa Key II, and Casa Key models from coverage.

As set forth above, Highland Holdings provided information regarding the advertisement to Mid-Continent, and despite Mid-Continent's initial (and as now acknowledged – incorrect) position, Highland Holdings repeatedly confirmed that the date of contracts, the date of closing, the date of construction, and the date of completion were irrelevant.  Highland Holdings stated its position that the advertising of the Owenburg, Casa Key II, and Casa Key occurred within the applicable policy periods. Highland Holdings also set forth in its answers to interrogatories. (*See* Answers to Interrogatories, signed and dated on October 21, 2015, Ex. K), that "The policy affords coverage in connection with the claims asserted in the Underlying Complaint and none of the exclusions relied upon by the Defendants in their reservations of rights letters or the affirmative defenses asserted in this case apply."  Also, as set forth above, Mid-Continent clearly alleges in its Counterclaim that the Owenburg and Casa Key designs were first advertised within the policy period.  (*See* Counterclaim, Doc. 32, ¶¶ 13, 14.)

Because the alleged infringement began within the Policy period, Mid-Continent has a duty to fully indemnify Plaintiffs in connection with the Underlying Lawsuit.  *Am. Cyanamid Co. v. Am. Home Assurance Co.*, 30 Cal. App. 4th 969, 982 (Cal. 1st App. Dist. 1994) (holding that language in offense-based policies regarding "offenses committed during the policy period" indicated "that the triggering event is the act, not the injury" and that the offense "must be committed during the policy period in order to trigger coverage" and there was "nothing in the policies to require that the resulting injury must also occur or manifest itself during the policy period"); *State Farm Fire &*

*Cas. Co. v. McGowan*, 421 F.3d 433, 438 (6th Cir. 2005) (holding that under an occurrence-based policy, although an injury had to manifest in order to trigger State Farm's obligation to defend, the policy required only that the occurrence take place during the policy period, not the resulting injury); *see also State Farm Fire & Cas. Co. v. Steinberg*, 393 F.3d 1226, 1230-1231 (11th Cir. Fla. 2004) (noting that the paucity of authoritative Florida case law interpreting advertising injury coverage requires courts to consult other jurisdictions' interpretations of similar policy provisions).

There is no record evidence to support any of Mid-Continent's affirmative defenses.  Mid-Continent has presented no evidence to carry its burden of proving the "Knowing Violation of Rights of Another exclusion." (*See* Doc. 26 ¶ 8.)  In addition, despite Mid-Continent's assertion in several of its affirmative defenses, coverage is not precluded "because there is not allocation of damages – as between covered and uncovered damages – in the settlement of the Underlying Action." (*See, e.g.* Doc. 26 ¶ 18.)  Rather, it is the insured's burden to be able to show that the settlement, or portions thereof, "represented costs that fell within the coverage provisions of the policy." *Keller Indus., Inc. v. Employers Mut. Liab. Ins. Co. of Wisconsin*, 429 So. 2d 779, 780 (Fla. 3d DCA 1983).  There is no requirement that such burden must be carried out within the settlement agreement itself.   Therefore, Highland Holdings respectfully requests a judgment that there was coverage under the Policy.

## 1.    All of the Policies Mid-Continent Issued to Highland Holdings are Relevant

Mid-Continent argues in its motion in limine (Doc. 57) that only one policy is at issue here – the 2006-2007 policy.  However, Mid-Continent clearly was aware from the time it sent reservation of rights letter that all of the policies would potentially be

implicated and has tried this issue by consent, as Highland Holdings has set forth in its response to the motion in limine (Doc. 65).

## 2.    Applicable Policy Language

Each policy contains "Coverage B Personal and Advertising Injury Liability," which provides in relevant part:

> We will pay those sums that the insured becomes legally obligated to pay as damages because of "personal and advertising injury" to which this insurance applies.  We will have the right and duty to defend the insured against any 'suit' seeking those damages.

> Section V(1) of the policies defines "advertisement" as:

> a notice that is broadcast or published to the general public or specific market segments about your goods, products or services for the purpose of attracting customers or supporters.  For purposes of this definition:

> > a.    Notices that are published include material placed on the Internet or on similar electronic means of communication. . . .

> The relevant type of advertising injury is defined in Section V(14)(g):

> "Personal and advertising injury" means injury, including consequential "bodily injury," arising out of . . . infringing upon another's copyright, trade dress or slogan in your "advertisement."

## 3.    Coverage Depends on When the Offense, Not the Injury, Occurs

Under the policies, the coverage does not depend on when the personal and advertising *injury* occurs; whether there is coverage depends on whether the *offense* is "committed" during the "policy period."

A policy exclusion applies if the first publication of the advertisement occurred before the policy period, but it is clearly undisputed that at least the Casa Key II and Owenburg models were first published during an applicable Mid-Continent policy period. (*See* Counterclaim, Doc. 32, ¶¶ 13-14.)

**4.      Highland Holdings Engaged in Advertising Activity**

The allegations in the underlying litigation fall within the coverage of Mid-Continent's insurance policies issued to Highland Homes because (1)  Home Design's lawsuit alleged a cognizable advertising injury; (2) Highland Homes engaged in advertising activity; and (3) there was some causal connection between the alleged advertising injury and the advertising activity.   *Elan Pharm. Research Corp. v. Employers Ins. of Wausau*, 144 F.3d 1372, 1375 (11th Cir. 1998).

Mid-Continent argues that Highland Holdings cannot prove the second and third prongs.   Regarding prong two, Mid-Continent contends that Highland Homes cannot prove that it engaged in advertising activity during the policy period.   This is a baseless argument because, as stated above, Mid-Continent concedes that two of the models were first advertised during the policy period.   How Mid-Continent can construe "advertising" as distinguishable from "advertising activity" is not clear.   As in *Hyman v. Nationwide Mut. Fire Ins. Co.*, 304 F.3d 1179, 1187 n.7 (11th Cir. 2002), where the court found that "by distributing catalogs to equipment manufacturers in an attempt to sell the allegedly infringing product, Double R clearly engaged in advertising," here Highland Holdings "clearly engaged in advertising" by marketing its floor plans on the Internet and by flyers "in an attempt to sell the allegedly infringing" homes.   *See also Elan Pharm. Research Corp. v. Employers Ins. of Wausau*, 144 F.3d 1372, 1377 (11th Cir. 1998) ("Moreover, the courts that have considered the issue of advertising activity in similar contexts have defined it in terms that include the dissemination of information to promote a product.).   The Eleventh Circuit in *Elan* determined that "the insurance contracts contain no express requirement that the insured must direct its advertising

activity either towards the general public or actual consumers" and that the insurer's "argument would have us ignore the reality of how drugs make their way to market." *Id.* "Identifying and contacting the target market for a prescription drug certainly will require marketing strategies and solutions that differ from the tactics used for products that have a more ubiquitous appeal." *Id.* Mid-Continent's argument that there is no causal connection because Highland Homes has not proven that each homebuyer saw the advertisement before purchasing is actually better directed toward this prong of the three-part test, but then it is also easily refuted. The argument "would have us ignore the reality" of how homebuyers purchase homes.

**5.     A Causal Connection Clearly Exists Between the Advertising Activity and the Alleged Advertising Injury**

Mid-Continent's arguments also fail as to the third prong. Here, the offense was complete in the advertisement and was caused by the advertisement itself, which establishes a causal connection. *Hyman*, 304 F.3d at 1191-92. For this inquiry, it does not even matter whether anyone actually purchased a home based on one of the advertisements because the copyright infringement claims as alleged became viable at the time the advertisements were published. *See id.*

To establish a copyright infringement claim, the copyright holder must only prove two elements – ownership of a valid copyright and "copying of constituent elements of the work that are original." *BUC Int'l Corp. v. Int'l Yacht Council Ltd.*, 489 F.3d 1129, 1142 (11th Cir. 2007). Thus, the offense is complete in the advertisement because all it takes to infringe the copyright is to copy the elements of the original work, which is what was allegedly done here when Highland Homes published its advertisements of the

floor plans.  Highland Homes' advertisements undisputedly used the alleged Home Design Services' copyrighted designs.  It is clear that copyright infringement may occur when copyrighted floor plans are reproduced in promotional brochures.  *See Donald Frederick Evans & Assocs., Inc. v. Cont'l Homes, Inc.,* 785 F.2d 897, 904-05 (11th Cir. 1986).  In addition, Home Design Services explicitly and repeatedly alleged in the underlying complaint that the copyright infringement occurred, inter alia, in connection with Highland Homes' advertisements, including that the Highland Holdings advertised the copied plans on its website.  Therefore, the "injury alleged emanates within the advertisement itself and requires no further conduct."  *Ryland Grp., Inc. v. Travelers Indem. Co. of IL*, No. CIV. A-00-CA-233 JRN, 2000 WL 33544086, at *6 (W.D. Tex. Oct. 25, 2000) (finding that there was a "clear causal connection" between the homebuilder's advertising activity and the copyright claim because the "advertising activity itself was alleged to have infringed" the copyright and "did not merely expose the infringement").

**6.      Mid-Continent will not be able to prove exclusions**

"[E]xclusionary clauses are construed even more strictly against the insurer than coverage clauses."  *Hyman v. Nationwide Mut. Fire Ins. Co.*, 304 F.3d 1179, 1196 (11th Cir. 2002).

**7.      Mid-Continent's Shifting Positions Regarding Coverage**

One hundred and fifty-six (156) homes initially formed the basis for the underlying lawsuit.   This was before additional Casa Key II, Owenburg, and Whitney houses were added to the underlying litigation and before the Casa Key model was added to the lawsuit.  The addition of the Casa Key model added 67 "accused" houses to the lawsuit.  Mid-Continent denied coverage to all except four (4) of the approximately

156 homes initially at issue in the underlying lawsuit.   The basis for Mid-Continent's asserted position was that they only provided indemnity for houses contracted for or constructed during the effective term of the policy, and not thereafter.

Mid-Continent has receded from this position over the course of this litigation – one of the many changes in its position.   Originally Mid-Continent denied coverage on the basis that the houses were not built within the policy period.   Then Mid-Continent decided that the relevant date became when the contracts were entered into on the homes. But, as Kirby Pancoast, senior vice president of claims and corporate representative, testified, Mid-Continent changed its position on that issue because the date the contract was entered into to build a house was irrelevant – "the only thing that matters is when the offense occurred."   Ms. Stevens also testified that the applicable dates for the purposes of coverage were the date of the advertisement and that the insurer must prove that the homeowner bought the house or contracted for the house based on an advertisement that the homeowner viewed on a date covered by the policy.

Mid-Continent's position that Highland Holdings had to somehow prove that the actual customers who ultimately purchased the houses actually looked at the advertising was only first communicated during Pancoast's deposition and never discussed with Highland Holdings' counsel.   However, Matulis told Mid-Continent from the outset that it was a coverage issue and Mid-Continent never asked personal counsel for Highland Holdings for any such evidence after that early discussion.

Pancoast even acknowledges that at least Stevens' initial determination on coverage was wrong.   Although Stevens mentioned there was only coverage for four of the houses because only four completed during the policy period, Pancoast

acknowledges that, "the triggering event for coverage is the offense."  Pancoast further testified, "I'm not aware of any policy requirement that requires the damages to occur within the policy period."  Pancoast made it clear that <u>the offense</u> – the infringement – <u>is the advertising</u>.

Not only did Highland Holdings provide all requested information regarding the triggering event of the offense of advertising, as stated above, Mid-Continent admitted in its counterclaim that the triggering event – the offense – the advertising – occurred within the policy for the Owenburg and Casa Key II models.  Mid-Continent stated that the "date that the Casa Key II design was first advertised by Highland Homes was June 7, 2007," and that the date the "Owenburg design was first advertised by Highland Homes was August-September of 2006."  It is thus undisputed in this case that the Mid-Continent policies at issue provided coverage for the advertising of the Owenburg and Casa Key II models.  In addition, Highland Holdings provided evidence that the Casa Key model was first advertised during the policy period.

Moreover, customers never buy houses sight unseen; the homebuyer always sees the advertising design before deciding to make a purchase.  It was never in dispute that the advertising for the Whitney was not advertised during the Policy, but the Whitney was only 10 houses.

Santurri and Boyles, the counsel hired by Mid-Continent midway through the underlying case, made a determination in October 2014 that settlement authority of at least $585,000.00 would be needed for mediation, which occurred in December 2014.  That amount did not include consideration of the Casa Key model.  Santurri testified that

if the case had gone to trial, the jury would likely have found infringement on all of the models.

Santurri informed Stevens that he recommended serving an offer of judgment, and he followed up several times on that issue, but he never received a response. Alycia Stevens attended mediation but left before it was over.   Boyles was only authorized by Ms. Stevens to offer $10,000.00.

Because Mid-Continent was not providing an adequate defense, was improperly adjusting the claim, and was continuously materially changing its defense, Highland Holdings informed Mid-Continent that it would reject Mid-Continent's defense in an email to the adjusters on March 7, 2015.  Mid-Continent did not respond to the March 7, 2015, email, and on April 15, 2015, Highland Holdings rejected the defense.

After rejecting the defense, Highland Holdings retained Santurri and Boyles to continue defending and thereafter entered into negotiations that resulted in a settlement agreement with Home Design in May-June 2015.   The total amount of settlement between Home Design and Highland Holdings was $650,000.00.   Highland Holdings also entered into a settlement with State National around the same time.  State National paid $100,000.00, although there was no coverage under State National's policy.

**D.**     **Whether the Defense was Properly Rejected**

James Matulis was the attorney originally appointed by the two carriers in the underlying litigation – Mid-Continent and State National.   (O'Toole pp. 6:16-7:16.) Highland Holdings was never asked nor did they provide consent to this selection by the insurers.   (*Id.* at 6:2-15.)   In a report to the adjusters on April 2, 2014, Matulis

recommended that an attempt be made to settle the case and requested settlement authority of $450,000.00.  (*See* Stevens p. 35:21-24.)

During the course of the litigation, Jim Matulis left his firm; as a result, midway through the case, the carriers hired Ryan Santurri along with his partner, Jeff Boyles, to defend Highland Holdings.  (Santurri p. 14:4-18; 15:14-25.)  Alycia Stevens was the adjuster handling the underlying litigation for Mid-Continent, and David Cribb was the adjuster handling the underlying litigation for State National.  (O'Toole p. 10:24-11:3.)

On March 3, 2014, State National filed a declaratory judgment action in this court seeking an adjudication that there was no coverage in connection with the underlying action.  Highlands Holdings answered that action and defended solely on the grounds of estoppel.  (*See* Order, Ex. A).  Subsequent to that time, the matter between Highlands Holdings and State National was settled for $100,000.00, based on the single issue of Highlands Holdings' claim for damages as a result of negligent claims handling that gave rise to an action for estoppel.  (O'Toole p. 28:14-25.)  Due to the clear language in the State National policy's exclusion, at no time did Highlands Holdings defend the action by asserting that coverage existed.  (*Id.* at 26:2-27:14.)  On June 5, 2014, Highlands Holdings instituted this action as a result of issues discussed hereafter.

The issue here is that Mid-Continent purported to supply a defense but the defense was inadequate.  Mid-Continent agreed to provide a defense under a reservation of rights, but it became clear to Highland Holdings over the course of the underlying litigation that the defense was, at best, only nominal.  The only thing Mid-Continent was attempting to provide was a way to avoid providing coverage due Highland Holdings under the policy.  Mid-Continent did everything it could to avoid

providing coverage under the policy, including shifting its position on why coverage was being denied every time its theory fell apart.  But coverage was not only likely but clearly present.

1.      **Mid-Continent Materially Changed the Defense**

Because Mid-Continent materially changed the defense, Highland Homes was permitted to reject the defense and settle the case.  *Mid-Continent Cas. Co. v. Am. Pride Bldg. Co., LLC*, 601 F.3d 1143, 1150 (11th Cir. 2010).  Mid-Continent not only refused to provide an adequate defense by failing to pay for defense costs; Mid-Continent continuously changed its position as to why there was no coverage.  There is a complete and total absence of any evidence that Mid-Continent ever sought information regarding advertising materials or their use until after this litigation began in earnest.  Pancoast addressed the foregoing by simply stating that it was the insured's duty to provide the information and not the insurer's duty to request it.  This position is not only contrary to well-established law regarding exclusions in insurance contracts; the insured, through O'Toole, actually asked Mid-Continent, through Stevens, to inform him exactly what was further needed to adjust the claim, but Stevens did not indicate that she needed any further documentation.

When it became clear that Mid-Continent had shifted its position and was obviously avoiding properly defending the case, Highland Holdings properly rejected the defense in a communication to the adjuster for Mid-Continent, as set forth above.

2.      **Mid-Continent's Defense Was Inadequate**

Highland Holdings is aware that current Florida law does not provide that, having accepted an insurer's defense, the policyholder may later reject the defense solely on

the grounds that the defense being provided was inadequate.  *Doe v. Onebeacon Am. Ins. Co.*, No. 1:11-CV-275-MP-GRJ, 2012 WL 5876566, at *5 (N.D. Fla. Nov. 21, 2012). Instead, the only way that a policyholder may reject a defense after initially accepting it and avoid violating the duty to cooperate is if the insurer materially changes the defense.  *Id.*  However, insureds should also be able to reject defenses currently being provided in situations such as the one in the case at bar.   Where an insured initially accepts the insurer's defense, relying on the insurer to actually defend, but where it turns out that after a series of continual changes of position it becomes clear that the insurer is doing everything to avoid coverage, including taking inconsistent positions, the insured should not have to continue to suffer from its initial decision to trust its insurer to do its job.  What is the purpose of dragging out litigation if a better result can be achieved by the policyholder taking control of its own defense?

There is some support for this position in the law.   For example, the court in *Continental Casualty Co. v. City of Jacksonville*, 550 F. Supp. 2d 1312, 1332 (M.D. Fla. 2007) *aff'd,* 283 F. App'x 686 (11th Cir. 2008), suggested that if the insured had unequivocally and finally rejected the defense, instead of an "illusory" rejection that kept the door open to return to the insurer's defense, the insured would not have breached the cooperation clause.  Also, the court in *Western Heritage Ins. Co. v. Montana*, 30 F. Supp. 3d 1366, 1375 (M.D. Fla. 2014) *aff'd*, 623 F. App'x 525 (11th Cir. 2015), stated that the insured could have rejected the defense if the insurer had materially changed the defense *or* "terminated the defense."  Here Mid-Continent, in effect if not explicitly, terminated the defense; therefore, Highland Holdings did not breach any obligation to cooperate by rejecting the defense.

### 3.     Mid-Continent Did Not Reasonably Attempt to Settle Within Policy Limits

Santurri asked Stevens in an email on January 23, 2015, whether she would authorize him to offer up to $200,000.00 for Mid-Continent in a combined deal that would include contribution from Mid-Continent, State National, and Highland Holdings, and Stevens replied, "Not at this time."

Santurri sent an email to Stevens on January 27, 2015, indicating that time was of the essence and the window of opportunity may be closing with Home Designs, but Stevens responded that the person she needed to discuss the matter with was out of the office that week.  Finally, on February 5, 2015, Stevens wrote an email to Santurri advising that Mid-Continent would contribute $125,000.00.  Stevens increased the offer to $135,000.00, in an email on March 3, 2015, communicated that the offer should resolve all matters, all house plans, including the Casa Key plan, pending declaratory judgment actions, and all future matters.  The issue of the experts, Fishkind and Koch, not getting paid, occurred during this same timeframe, January to April, 2015.

### 4.     Mid-Continent Cannot Prove its Failure to Cooperate Defense

As set forth above, Mid-Continent will not be able to show that Highland Holdings failed to cooperate by rejecting Mid-Continent's defense.  Even if Mid-Continent could prove a failure to cooperate, Mid-Continent would not be released from its obligation to pay because it cannot prove that the failure was "a material breach" and that the breach "substantially prejudiced" Mid-Continent's rights in defense of the cause.  *Mid-Continent Cas. Co. v. Am. Pride Bldg. Co., LLC*, 601 F.3d 1143, 1150 (11th Cir. 2010); *Mid-Continent Cas. Co. v. Basdeo*, 742 F. Supp. 2d 1293, 1338 (S.D. Fla. 2010) *aff'd,* 477 F. App'x 702 (11th Cir. 2012) (finding that an insured's "failure to cooperate was not, as

a matter of law, so prejudicial as to completely release Mid-Continent from its obligations under the Policy"); *see also State Farm Mut. Auto. Ins. Co. v. Curran*, 135 So. 3d 1071, 1079 (Fla. 2014) (stating that it is the insurer's burden to show "actual prejudice").

## 5.     The Settlement was Reasonable

Highland Holdings has shown that the settlement of $650,000.00 was reasonable.  Home Design was at least seeking damages – at least – in the amount of approximately $1.35 million to $3.42 million before the Casa Key model was added to the underlying litigation.   Even the attorneys that were representing the carriers in the underlying litigation agree that it was reasonable, even without the addition of the Casa Key model, and had sought $585,000.00 of settlement authority before the Casa Key model was added to the litigation.   The test is "what a reasonably prudent person in the position of the [insurer] would have settled for on the merits of plaintiff's claim." *Wrangen v. Pa. Lumbermans Mut. Ins. Co.*, 593 F. Supp. 2d 1273, 1279 (S.D. Fla. 2008) (citations and quotation marks omitted).   Courts consider "not only such objective factors as the extent of plaintiff's injuries, but also certain subjective factors including the degree of certainty of the tortfeasor's subjection to liability, the risks of going to trial and the chances that the jury verdict might exceed the settlement offer."   *Id.*   (citations, punctuation marks, and quotation marks omitted).   "A determination of reasonableness of the settlement agreement is made 'in view of the *degree of probability of the insured's success* and the size of the possible recovery." *Id.* (citations and quotation marks omitted).

Mid-Continent carries the ultimate burden of proof to show bad faith and lack of reasonableness. *Bradfield v. Mid-Continent Cas. Co.*, 15 F. Supp. 3d 1253, 1257 (M.D. Fla. 2014). Mid-Continent clearly cannot do this and has not even attempted to do so in its pretrial filings.

Although it is clear that the settlement was reasonable, the issue is somewhat irrelevant in light of the fact that this was not a *Coblentz* agreement. Highland Holdings paid for the settlement out of its own pocket. Therefore, Mid-Continent must pay the the amount of settlement, "at least within its policy limits, in the absence of a showing of collusion or fraud." *Steil v. Fla. Physicians' Ins. Reciprocal*, 448 So. 2d 589, 592 (Fla. 2d DCA 1984). Mid-Continent has not even attempted to show collusion or fraud – likely because it knows that it will not be able to.

Again, regardless of the above issues, if there is coverage under the policies, Mid-Continent must indemnify Highland Homes, because Mid-Continent cannot show that it was prejudiced by any alleged non-cooperation on the part of Highland Homes.

**E.    Highland Holdings Did Not Fail to Allocate**

Regarding Mid-Continent's position that Highland Holdings failed to allocate the settlement, Highland Holdings respectfully refers the Court to its response in opposition (Doc. 45) to Mid-Continent's motion for summary judgment.

<u>**CERTIFICATE OF SERVICE**</u>

I HEREBY CERTIFY that on the 27th day of January, 2016, I electronically filed the foregoing with the Clerk of Court by using the CM/ECF system, which will send an electronic copy to Ronald L. Kammer, Esquire at <u>rkammer@hinshawlaw.com</u>, Edward

Sylvester, Esquire at esylvester@hinshawlaw.com and mislacalleiro@hinshawlaw.com,

2525 Ponce de Leon Boulevard, 4th Floor Coral Gables, Florida  33134.

**VALENTI CAMPBELL TROHN TAMAYO & ARANDA**

By:    /s/ John Marc Tamayo
       John Marc Tamayo
       Florida Bar No. 030910
       j.tamayo@vctta.com
       Jennifer M. Vasquez
       Florida Bar No. 071942
       j.vasquez@vctta.com
       1701 S. Florida Avenue
       Post Office Box 2369
       Lakeland, FL  33806-2369
       Tel:  (863) 686-0043
       Fax: (863) 616-1445

       and

**LILLY, O'TOOLE & BROWN, LLP**
Neal L. O'Toole
Florida Bar No. 0691267
notoole@loblawyers.com
310 East Main Street
Bartow, FL 33830
Tel: (863) 533-5525
Fax: (863) 533-0505

Attorneys for Plaintiff